AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
for the

Middle District of Florida

| | |
|---|---|
| United States of America<br>v.<br>Jonathan Jermaine Thomas<br>and<br>Aaron Lee Bostick, Jr.<br><br>*Defendant(s)* | )<br>)<br>)  Case No.<br>)        5:21-mj-1061-PRL<br>)<br>)<br>) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___September 9, 2020___ in the county of ___Marion___ in the

___Middle___ District of ___Florida___ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1), (b)(1)(A)<br>and 18 U.S.C. § 2 | Possession with Intent to Distribute 400 grams or more of Fentanyl |

This criminal complaint is based on these facts:

See attached affidavit

ꙮ Continued on the attached sheet.

_____
*Complainant's signature*

SA Paul W. Smith, DEA
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  ___04/26/2021___

_____
*Judge's signature*

City and state:  ___Ocala, Florida___

Philip R. Lammens, United States Magistrate Judge
*Printed name and title*

STATE OF FLORIDA                     CASE NO. 5:21-mj-1061-PRL

COUNTY OF MARION

## AFFIDAVIT IN SUPPORT OF COMPLAINT

I, Paul W. Smith, Special Agent, U.S. Drug Enforcement

Administration (DEA), United States Department of Justice, being duly

sworn, state as follows:

### Introduction

1.      I make this affidavit in support of a criminal complaint for

Jonathan Jermaine Thomas ("THOMAS") and Aaron Lee Bostick, Jr.

("BOSTICK").  Florida Department of Highway Safety and Motor Vehicle

(DHSMV) records show that both men are residents of Marion County,

within the Middle District of Florida.  Based on the following facts, there is

probable cause to believe that THOMAS and BOSTICK have committed a

violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A) and 18 U.S.C. § 2, specifically,

possession with intent to distribute 400 grams or more of a mixture or

substance containing a detectable amount of N-Phenyl-N-[1-(2-phenylethyl)-4-

piperidinyl] propanamide (fentanyl).

2.      The information set forth in this affidavit is based upon my own

personal knowledge as well as information provided to me by other law

enforcement officers and is provided solely for the purpose of establishing

probable cause in support of the requested arrest warrants. I have not included every fact and circumstance known to me in this affidavit, but I have included facts and circumstances that I believe establish probable cause to support the requested criminal complaint.

3.      I am a DEA Special Agent and I am an "investigator or law enforcement officer" of the United States within the meaning of 18 U.S.C. § 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations and make arrests for offenses enumerated in 18 U.S.C. § 2516(1). I conduct criminal investigations of, and make arrests for, narcotics violations codified in Title 21 of the United States Code. I have been a Special Agent with DEA for approximately twenty-three years. Since 2010, I have been assigned to the Gainesville, Florida Resident Office.

**Probable Cause**

4.      On September 9, 2020, at approximately 10:40 a.m., Deputy Dasher of the Gainesville-Alachua County Drug Task Force (GACDTF) was in his assigned marked patrol unit at mile marker 375 on I-75 monitoring northbound traffic. At that time, he observed a white Chrysler Pacifica traveling northbound with what appeared to be illegal window tint.

5.      GACDTF Deputy Dasher pulled behind the Pacifica and observed the driver make two improper lane changes. Deputy Dasher

2

activated his emergency lights at approximately mile marker 379.  The driver,

subsequently identified as THOMAS, stopped the Pacifica a short time later

on the right shoulder of Payne's Prairie, against the guard rail.  Deputy Dasher

determined this to be an unsafe location for a traffic stop.  He approached the

vehicle and made contact with the occupants through the front passenger-side

window.  The passenger, subsequently identified as BOSTICK, rolled the

window down halfway and Deputy Dasher immediately detected the strong

odor of marijuana emanating from the vehicle.  Deputy Dasher identified

himself and the reasons for the traffic stop and asked the driver to move the

vehicle up to the northbound rest stop, approximately a mile up the road, due

to the unsafe location.  THOMAS complied and moved forward to the rest

stop.

      6.      While at the rest stop, Deputy Dasher again approached the

vehicle from the passenger side and BOSTICK rolled the front window down

completely.  Deputy Dasher still smelled the strong odor of marijuana

emanating from the vehicle, and he observed a large multicolored plastic

package of a leafy green substance.  Based on his training and experience, he

believed it to be marijuana.  The package was sitting on the transmission

hump, under the radio, within reach of both occupants.  The package had a

paper label affixed to it with an "Rx" logo and some handwriting along with

printed words. Deputy Dasher asked THOMAS for his license and THOMAS handed him a Florida license along with a Florida medical marijuana identification card. Deputy Dasher asked THOMAS to step out of his vehicle and walk back to the patrol unit. Deputy Dasher informed THOMAS that he would not be issuing him a citation, just a written warning for the traffic infractions. He told THOMAS that he observed the marijuana and asked if there was anything else in the vehicle, which THOMAS denied.

7.      Deputy Dasher believed that the occupants of the vehicle staged the marijuana in plain view in the Pacifica. He also noted that THOMAS quickly produced his medical marijuana card without any request from law enforcement.

8.      Deputy Dasher requested the assistance of another GACDTF officer as he continued to speak with THOMAS. According to Deputy Dasher, it appeared that THOMAS was nervous in the encounter with law enforcement and his statements regarding his travels were initially lacking specificity and subsequently appeared conflicting. Deputy Dasher also noted that THOMAS appeared to lack details on the Pacifica's rental, which was rented by a third party. Deputy DASHER asked THOMAS if there were any firearms, large sums of money or drugs, other than the marijuana, in the vehicle. THOMAS indicated there was not, but then discussed what a "large

4

sum" of money was with Deputy Dasher. THOMAS advised he believed a large sum to be "twenty or thirty thousand dollars," which he did not have. THOMAS did admit that he had some cash in his pocket.

9.     At that time, GACDTF Deputy Stephenson assisted at the scene and made contact with BOSTICK, the front seat passenger. Deputy Stephenson asked BOSTICK if he had a medical marijuana card, which BOSTICK denied. However, BOSTICK admitted to Deputy Stephenson that he had some marijuana on his person and he had been smoking marijuana in the vehicle earlier. Deputy Stephenson also observed bits and pieces of suspected marijuana on BOSTICK's shirt as they were speaking.

10.     Deputy Dasher used his department issued tint meter to check the window tint on the front passenger window of the rented Pacifica. He received three separate readings of 18 percent allowable light, which was in violation of Florida law for front side window tint.

11.     Deputy Dasher informed THOMAS that they would be conducting a probable cause search of the vehicle. Deputy Stephenson performed a frisk of BOSTICK's person and located a small amount of marijuana in his right front pants pocket. Deputy Dasher performed a frisk of THOMAS' person and felt a hard object in his left pants pocket, which was subsequently determined to be an Albuterol inhaler and a cigarette lighter.

Deputy Dasher discovered a large wad of cash in THOMAS's right pocket, later determined to total $1,753. THOMAS and BOSTICK were then placed in the back seat of Deputy Stephenson's patrol vehicle while a probable cause search of the vehicle was conducted.

12.     Sgt. Jones and Cpl. Davis arrived on scene to assist Deputies Stephenson and Dasher with searching the Pacifica. Sgt. Jones located a cigar packet underneath the package of cannabis that was previously observed. The packet contained two cigars with a leafy green substance inside of them. That substance was also believed to be marijuana. One of the cigars was partially smoked and they both weighed approximately two grams each. The multicolored package of marijuana with the "Rx" label was actually discovered to contain another clear sandwich baggy of marijuana inside of it, along with loose marijuana. According to Deputy Dasher, it was later discovered the label on the cannabis package was fake. A quick internet search revealed that exact label could be purchased online. The label did not have any of the required information on it as required by Florida's medical marijuana laws, such as dispensary name, patient name, strain, THC or cannabinoid strength, and dosage.

13.     According to Deputy Dasher, the search of the trunk area of the vehicle revealed two pieces of luggage that appeared to have been staged.

There was minimal clothing in each bag, neither of which appeared to be enough clothing for a two-week trip, and one of the pieces of luggage still had a tag on it.

14.     Cpl. Davis discovered a suspicious package concealed in a natural void between the plastic interior and metal skin of the vehicle in the rear passenger-side quarter panel. The package was removed and found to be rectangular, brick-shaped, wrapped in brown packing tape, and further placed inside six clear vacuum sealed bags. The package bore handwritten printed markings "Primo Toyota" on the center, and "TJ" was written on the upper left and bottom right corners. Based on Deputy Dasher's training and experience, as well as the other officers and agents involved, the package was consistent with a kilogram of illegal narcotics.

15.     Deputy Stephenson and Sgt. Jones placed the package on the hood of Deputy Stephenson's patrol vehicle to be tested. Both BOSTICK and THOMAS, from their position within Deputy Stephenson's vehicle, had a clear view of the package on the hood. A subsequent review of Deputy Stephenson's in-car audio and video revealed that at the precise time the package was placed on the hood, THOMAS said to BOSTICK, "Dang . . . They got it Bruh." Immediately after having made the statement, THOMAS realized he may have made an error and looked directly at the patrol unit's

7

camera, then put his face in his hands toward his lap and even covered his face with his shirt. The entire time, BOSTICK looked directly out the side window, away from THOMAS and the search of the Pacifica. Based on my review of the audio/video and BOSTICK's behavior, I believe BOSTICK was aware of the recording device. BOSTICK did not react to his surroundings and did not even react when THOMAS made the statement regarding the discovery of the package. He never inquired what THOMAS was talking about, nor did he speak to THOMAS in any way while in the patrol vehicle.

16.     Sgt. Jones made a small cut into the suspicious package so it could be tested. He discovered another vacuum sealed bag underneath the packing tape and it contained a white powdery substance. The substance tested presumptive positive for the properties of fentanyl. The search of the Pacifica continued and a small 8-ounce clear plastic water bottle was discovered in the driver's side door cup holder. The bottle was mostly full of a syrupy green liquid and had the odor of cough syrup. According to Deputy Dasher, and based on his training and experience, the substance was consistent with Promethazine Syrup with Codeine. The substance is controlled and available by prescription only. Deputy Stephenson located the physical copy of the rental agreement, which showed the vehicle was rented

by "S.C." in Orlando, Florida, on September 8, 2020, and due back at the same location on September 10, 2020.

17.     At approximately 11:00 a.m., I learned about the traffic stop from Task Force Officer (TFO) James Bray, a member of the GACDTF assigned to the GRO from the Gainesville Police Department. A short time later, SA Dustin Barber, TFO Jason Webb and I met the GACDTF officers at the GRO where they transported THOMAS and BOSTICK for processing and possible questioning.

18.     Subsequent to arrival at the GRO and after being briefed by the GACDTF officers, SA Barber, TFO Webb and I removed BOSTICK from the holding cell and (at approximately 1:00 p.m.) transferred him to the interview room at the GRO. The following is a summary of the interview conducted with BOSTICK.

19.     At approximately 1:06 p.m., SA Barber read BOSTICK his constitutional warnings directly from a form DEA-13A, as witnessed by TFO Webb and me. Following the admonishment, BOSTICK agreed to answer agents' questions. Agents asked how BOSTICK knew the driver of the Pacifica (THOMAS), the person he was arrested with. BOSTICK advised that he only knew THOMAS as "Webbie" and did not know his real name. BOSTICK stated that he and THOMAS were "friends of friends." BOSTICK

9

advised that he ran into THOMAS at a Labor Day party over the previous

weekend at BOSTICK's "brother's house," where they discussed THOMAS's

intention of making a trip to Detroit, Michigan. BOSTICK added that

THOMAS' brother was called "Ish" and they were not real brothers but rather

"street brothers." BOSTICK claimed that he asked THOMAS if he could

accompany him to Detroit because BOSTICK has family there and wanted to

take advantage of a free ride. BOSTICK claimed that once he arrived in

Detroit, he planned to either rent a car or drive his cousin's car home when he

was ready to return to Florida.

20.    Agents asked BOSTICK where he and THOMAS departed from

on that date, immediately before the stop. BOSTICK claimed that on the

morning of September 9, 2020, he met THOMAS at the Kangaroo gas station

located on State Road 200 near I-75 in Ocala, Florida. The gas station

BOSTICK was referring to is a former Kangaroo gas station. On the day they

allegedly met there, it was operating as a Circle K gas station. When agents

asked if his vehicle would still be parked at the gas station, BOSTICK advised

that he was dropped off at the location by his "girl" and met with THOMAS,

who was driving the white Chrysler Pacifica rental. Agents asked BOSTICK

who rented the Pacifica and he advised it was THOMAS' "girl." BOSTICK

advised that he and THOMAS departed the gas station and drove to the

10

Region's Bank located on SR 200 (College Road).  BOSTICK stated that
THOMAS deposited an undetermined amount of cash via the drive through
teller.  Thereafter, they departed northbound on I-75, making no other stops
until their encounter with the deputy.

21.     On September 13, 2020, I conducted a review of the Alachua
County Jail "inmate calls" system, querying BOSTICK name.  I identified
numerous calls placed from the jail by BOSTICK and reviewed those calls.  I
identified one call made from BOSTICK on September 12, 2020, at
approximately 1:56 p.m., to an unknown male (UM) he called "Ish" at
telephone number (xxx) xxx-2228.  During that call, BOSTICK requested the
UM assist his (BOSTICK's) female friend with recovering his car from it's
current location.  BOSTICK described the location of his parked car to the
UM as best he could, but it appeared BOSTICK was being cryptic to avoid
detection and monitoring by law enforcement.  BOSTICK ultimately
conveyed sufficient information to the UM so that the UM could ascertain the
car's location.  Based on the limited directions provided by BOSTICK giving
the vehicle's general area, and based on our overall investigation of
THOMAS, I concluded the vehicle may be parked at THOMAS's residence,
5750 SW 63rd Place Road, Ocala, Florida.

11

22.     The following day, September 14, 2020, at approximately 8:28 a.m., TFO Webb drove by THOMAS's Marion County residence and observed BOSTICK's silver 2003 Cadillac sedan parked there.  The presence of BOSTICK's car at that location contradicts his statement to agents that he met THOMAS at the gas station and was dropped off there by his "girl."  It also indicates that BOSTICK is familiar with THOMAS's residence and that he was attempting to deceive DEA agents in order to shield himself from the possession of the kilogram of fentanyl found in the Pacifica.

23.     Accordingly, based on all the available evidence, THOMAS and BOSTICK departed Marion County on September 9, 2020, with the kilogram of fentanyl hidden in the Pacifica.  In my experience, this quantity of fentanyl is consistent with distribution, not personal use.

24.     On January 14, 2021, I received the chemical analysis report from the DEA Southeast Laboratory pertaining to the white powdery substance (fentanyl) discovered and seized from the Pacifica on September 9, 2020.  That report identified the substance as N-Phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] propanamide (fentanyl), with a total net weight (without packaging/wrappings) of 960.2 grams.

12

## Conclusion

25.    Based on the foregoing facts and opinions, my experience and training, and consultation with other law enforcement agents experienced in drug investigations, I believe that there is probable cause to believe that THOMAS and BOSTICK have committed a violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A), and 18 U.S.C. § 2, specifically possession with intent to distribute 400 grams or more of a mixture or substance containing a detectable amount of fentanyl.

This concludes my affidavit.

Paul W. Smith, Special Agent
Drug Enforcement Administration

Subscribed and sworn to before
me this __26__ day of April, 2021.

Philip R. Lammens
United States Magistrate Judge

13